Filed 2/24/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| MARK ROTH,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>PHILIP M. JELLEY, as Trustee,<br>etc., et al.,<br><br>        Defendants and Respondents. | A155742<br><br>(Contra Costa County<br>Super. Ct. No. MSP1700555) |

Petitioner Mark Roth (Mark) petitioned the probate court to be recognized as the beneficiary of a trust created by his grandfather pursuant to the default distribution provision of his grandfather' will. The probate court rejected the petition on the ground that an order made in the probate of the grandfather's estate in 1991 (which we refer to as the "1991 Decree") eliminated Mark's interest in the trust and was binding on him, even though he received no notice of the court proceeding that resulted in the 1991 Decree. This appeal presents the question whether Mark had a property interest in the testamentary trust created by his grandfather such that he had a due process right to notice and an opportunity to be heard before the probate court could enter the 1991 Decree that eliminated his interest in the trust.

Mark's grandfather, McKie Roth Sr. (McKie Sr.) created a trust in his will for the benefit of his wife Yvonne Roth (Yvonne) during her life and granted her a testamentary power of appointment over the remainder. The

1

will provided a default distribution scheme in case Yvonne did not exercise her appointment power, under which McKie Sr.'s three adult children from a prior marriage and the Yvonne's one adult son from a prior marriage would each take a one-quarter share of the remainder of the trust, with the proviso that, if an adult child did not survive Yvonne, then that child's surviving issue would take that child's share per stirpes. Thus, under the will, the issue of each of the four adult children had a contingent remainder interest in the trust, subject to divestment by Yvonne's exercise of her appointment power.

When McKie Sr. died in 1988, his three adult children raised claims against their father McKie Sr.'s estate unrelated to the trust; they eventually settled their claims with McKie Sr.'s estate, Yvonne (his surviving wife), and the estate executor. One of the terms of the settlement was that the McKie Sr.'s three adult children disclaimed any interest in the trust.

In 1991, the probate court issued a decree of final distribution of the McKie Sr.'s estate—the 1991 Decree—which included language changing the default distribution of the trust upon Yvonne's death, ostensibly based on the terms of the settlement. The 1991 Decree specified that the remainder of the trust was to be distributed solely to Yvonne's son or his surviving issue in case of default (i.e., failure of Yvonne to exercise her testamentary power of appointment). But McKie Sr.'s grandchildren (specifically, Mark and the other then-living issue of McKie Sr.'s three adult children) were not given prior notice of the 1991 decree, even though the decree *eliminated* their contingent interests in the remainder of the trust. Yvonne died in 2016 without having exercised her testamentary power of appointment.

Mark's father McKie Roth Jr. (McKie Jr.) predeceased Yvonne. Mark petitioned the probate court to be recognized as a beneficiary of the trust

2

pursuant to the default distribution provision of McKie Sr.'s will. He asserted the 1991 Decree was void because he never received notice of the proceeding that culminated in the 1991 decree.

At the parties' agreement, the probate court decided the following dispositive issue in a bifurcated proceeding: was the 1991 Decree binding on the parties? The court determined the 1991 Decree was binding even though Mark received no prior notice because, in the court's view, Mark had no cognizable property interest in the trust.

We conclude, however, that Mark did have a property interest in the trust in 1991 and that the 1991 Decree adversely affected his interest. Since it is not contested that Mark's existence and address were reasonably ascertainable at the time, due process required that Mark be given notice of the proceeding that resulted in the 1991 Decree and an opportunity to object. Because Mark was not given such notice, the 1991 Decree is void. Accordingly, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

McKie Sr. and his wife Marion Roth had three children, McKie Jr. (Mark's father), Diane Roth Lauer (Diane), and Joanne Roth Gibbons (Joanne). Marion Roth died in 1966.

After Marion died, McKie Sr. married Yvonne, who had one son from a prior marriage, respondent James Barron (James).

McKie Sr. died in 1988.

*The MWR Will and the FYR Trust*

McKie Sr. left a will and codicil (MWR Will), which created two trusts, the "First Yvonne Roth Trust" (FYR Trust) and the "Second Yvonne Roth Trust" (SYR Trust) with respondent Philip M. Jelley, an attorney, named as trustee. In both trusts, the trustee was to pay the net income to Yvonne, and

3

portions of the principal could be distributed to Yvonne as necessary for her maintenance, support, and comfort and as needed in an emergency. This appeal involves the FYR Trust only.

The FYR Trust was described in the fourth paragraph of the MWR Will. Subparagraph (c) of the fourth paragraph specified that the trust would terminate upon Yvonne's death, and Yvonne was granted a testamentary power of appointment over the balance of the trust. Subparagraph (d) provided a default scheme of distribution of the balance of the trust at its termination if Yvonne did not exercise her testamentary power of appointment.

The relevant language reads, "Any portion of the principal and accrued and undistributed income of this trust not validly and effectively appointed by my said wife pursuant to subparagraph (c), shall, upon the death of my said wife, be distributed in equal portions to McKie W. Roth, Jr., Diane Roth Lauer, Joanne Roth Gibbons and James Barron, provided however if such persons should not be then living, but leave issue surviving them, then such issue shall take per stirpes, the portion that such individual would have taken if then living . . . ."

*Probate of McKie Sr.'s Estate*

In 1988, Jelley filed a petition for probate of the MWR Will and to be appointed executor of McKie Sr.'s estate. Notice of the probate petition was served by mail to Yvonne, McKie Jr., Diane, Joanne, James, William Henry Barron (James's son), and James C. Soper (the person named as alternate executor in the MWR Will). These persons' names, their relationships to McKie Sr., and their addresses were listed in the MWR Will.

Mark, who was over the age of 21 when McKie Sr. died, was not named on the proof of service of the notice of the probate petition.

4

Notice of the probate petition was also given by publication.

Settlement Agreement

Prior to his death, McKie Sr. served as trustee of the Marion Roth Trust, whose beneficiaries were McKie Sr., McKie Jr., Diane, and Joanne. When McKie Sr. died, McKie Jr. became the successor trustee. In July 1988, McKie Jr. filed a creditor's claim against McKie Sr.'s estate. By 1990, there were various claims and objections pending in the probate of McKie Sr.'s estate and the separate probate of the Marion Roth Trust and two lawsuits alleging legal malpractice against Jelley and his law firm pending in Marin County. These claims, objections, and lawsuits were based on allegations of misconduct by McKie Sr., his attorney Jelley and Jelley's law firm (among other things) and included objections to the final account and report of trustee McKie Sr. in the Marion Roth Trust probate case and objections to the first account and report of executor Jelley in the McKie Sr. estate probate case.

In April 1990, the disputants reached a settlement embodied in a document titled "Settlement and Release Agreement" (Settlement Agreement). The signatories were, on one side, McKie Sr.'s adult children, McKie Jr., Diane and Joanne (together referred to as "Claimants" in the Settlement Agreement) and, on the other side, Jelley, his law firm and Yvonne ("Respondents"). Claimants settled and released all pending claims related to McKie Jr.'s alleged misconduct in managing Claimants' mother's trust (the Marion Roth Trust), as well as all other claims known or unknown against Respondents in exchange for consideration that included payment of $ 2,250,000. The payment was from McKie Sr.'s estate (not from the FYR Trust) and was paid in part to Diane as a beneficiary of the Marion Roth

5

Trust and in larger part to McKie Jr. as the successor trustee of the Marion Roth Trust.

The Settlement Agreement included a term regarding Claimants' interest in the FYR Trust. Paragraph 2.a.(i) of the agreement provided, "Claimants irrevocably disclaim and renounce all other interest in the Estate of McKie W. Roth, Sr., and the First Yvonne Roth Trust . . . ." The agreement also provided, "All of the terms and provisions contained herein shall inure to the benefit of and shall be binding upon Claimants and Respondents and their respective legal representatives, successors and assigns."

The probate court approved the Settlement Agreement and authorized the executor to pay out of McKie Sr.'s estate $2,250,000 according to the terms of the Settlement Agreement. There is no record evidence that a copy of this order was formally served on Mark, and Mark denies being served with the order.

1991 Decree

In August 1991, Jelley as executor of McKie Sr.'s estate filed his third and final account and report and petition for final distribution of the estate (Final Account and Petition for Distribution). In the Final Account and Petition for Distribution, Jelley averred that the bulk of the estate was distributable "upon the terms set forth in paragraphs FOURTH [describing the FYR Trust] and SIXTH of the [MWR W]ill . . ., *as modified* by paragraphs 2.a.(i) and 2.a.(iv) of the Settlement and Release Agreement."[1] (Italics

---

[1] As we have seen, McKie Sr.'s three adult children disclaimed any interest in the FYR Trust in paragraph 2.a.(i) of the Settlement Agreement. In paragraph 2.a.(iv), they promised (1) not to assert any claims against the McKie Sr. estate, (2) not to object to the second account and final report of the executor in the McKie Sr. estate, and (3) as to the SYR Trust, not to object to any account or other proceeding except as provided elsewhere in the agreement (regarding administration of the SYR Trust only).

6

added.)  However, no proposed modified terms of the FYR Trust were included in the Final Account and Petition for Distribution.

Mark was not named on the proof of service for the hearing on the Final Account and Petition for Distribution.

In September 1991, the probate court approved an order prepared by Jelley's law firm titled "Order Settling Third and Final Account and Report of Executor, Approving Payment of Balance of Statutory Compensation to Executor and His Attorneys and For Final Distribution of the Estate."  This is the 1991 Decree that Mark claims is void due to lack of notice.

The 1991 Decree stated the distribution of assets was based on "the terms of the decedent's will, the Settlement and Release Agreement and the laws of the State of California."  Subdivision IV of the 1991 Decree described the terms of the FYR Trust (to which estate assets were distributed).  The first three subparagraphs generally tracked the language of the MWR Will.

Subparagraph (d) of Subdivision IV, however, varied from paragraph fourth, subparagraph (d) of the MWR Will, the default distribution provision. It stated the following term of the FYR Trust: "(d) Any portion of the principal and accrued and undistributed income of this trust not validly and effectively appointed by Yvonne Roth pursuant to subparagraph (c), shall, upon the death of Yvonne Roth, be distributed to James Barron, or, if James Barron shall not be then deceased leaving descendants then living, to the then living descendants of James Barron per stirpes . . . ."  Thus, under the 1991 Decree, if Yvonne did not exercise her testamentary power of appointment, the remainder of the FYR Trust would be distributed to James or, if he predeceased Yvonne, to his issue alone upon Yvonne's death.

There is no record evidence that a copy of the 1991 Decree was formally served on Mark, and Mark denies being served with the decree.

7

Declination of Exercise of Power of Appointment

On August 12, 2005, Yvonne signed a document called "Declination of Exercise of Power of Appointment" (Yvonne's declination). It was prepared by James Soper, identified as the attorney for Jelley as "Trustee," and was captioned for filing in the McKie Sr. estate probate case. Yvonne's declination referred to and quoted from the 1991 Decree as the source of her testamentary power of appointment and did not mention the MWR Will. It provided, "Yvonne Roth does hereby decline to exercise her power of appointment set forth in the [1991] Decree . . . ."

*The Current Petition*

McKie Jr. predeceased Yvonne, leaving Mark as his sole issue. In October 2016, Yvonne died without having exercised the power of appointment over the remainder of the FYR Trust. McKie Sr.'s other children, Diane and Joanne, survived Yvonne.

Mark Petitions to be Recognized as a Beneficiary of the FYR Trust

In April 2017, Mark filed a petition in the matter of the FYR Trust. Mark sought orders directing the trustee to recognize him as a beneficiary of the trust and imposing a constructive trust on one-half of any distributions of the residue already made, among other things.

Mark alleged that, as a consequence of the Settlement Agreement, he and James are now the only two vested beneficiaries of the residue of the FYR Trust pursuant to the default distribution provision of the MWR Will (Diane and Joanne having disclaimed their interest in the trust). He asserted the 1991 Decree was void to the extent it "purports to affect [his] interests" in the FYR Trust on grounds of (1) "lack of due process rights to notice and opportunity to be heard" and (2) "failure to comply with Cal.

Probate Code §§ 15403, et seq.," which govern the modification or termination of an irrevocable trust such as the FYR Trust.

Jelley and James Respond to the Petition

Jelley as trustee and James filed separate answers, objections, and responses. In his answer, Jelley alleged the FYR Trust was created by the 1991 Decree and denied Mark was a beneficiary of the trust. Jelley and James both asserted as affirmative defenses laches, estoppel, waiver, unjust enrichment, and lack of standing.

The Parties Agree to Bifurcation

At a hearing on April 3, 2018, Mark, Jelley, and James agreed to bifurcate the trial of certain issues raised by Mark's petition. The parties framed the first issue to be decided as whether the parties were bound by the 1991 Decree. The parties together filed "Stipulated Facts re Bifurcated Issue as to Whether 1991 Decree of Distribution Binds Parties," which included documents related to the probate of McKie Sr.'s estate. According to the probate court, the parties "agreed to brief the issues and submit them on oral argument as a matter of law."

The Probate Court Rules Against Mark

The court issued its decision in a written "Order Denying Mark Roth's Petition for Orders Regarding the First Yvonne Roth Trust" on September 27, 2018. It rejected Jelley and James's argument that the FYR Trust did not exist until it was funded by the 1991 Decree and determined instead that the FYR Trust came into existence when McKie Sr. died in 1988. The court further recognized that "Mark's future interest as a contingent remainder beneficiary also came into existence when McKie Sr. died" and that "Mark's interest could not be defeated by McKie Jr.'s forfeiture of his intermediate or precedent interest," citing *Estate of Lefranc* (1952) 38 Cal.2d 289, 297.

9

But, the court found, "McKie Jr. received his interest in the trust" "[b]y way of the Settlement Agreement," and "because McKie Jr. received his interest under the trust while he was alive (before he predeceased Yvonne), Mark's contingent remainder interest did not vest."

The court next observed, "Because he may have had a property right based on his future contingent remainder interest in the trust, Mark should have objected at the time of the Court's approval of the Settlement Agreement [in 1990], or before the issuance of the 1991 [Decree]." The court went on to consider whether Mark received sufficient notice of the McKie Sr. estate probate proceedings "from a due process perspective."

First, the court found Mark was not statutorily entitled to personal notice of the hearing on the 1991 Decree under Probate Code section 11000.[2] Second, it determined that due process considerations did not entitle Mark to personal notice of the hearing either. The court believed Mark "had no more than a unilateral expectation to a share of the [FYR] Trust" and "[t]hat expectation never amounted to a legitimate claim of entitlement to it because his interest did not vest for lack of . . . two conditions precedent."[3] It

[2] Probate Code section 11000 provides that notice of a hearing on an account of an estate "shall" be given to "[e]ach known heir whose interest in the estate would be affected by the account" and "[e]ach known devisee whose interest in the estate would be affected by the account." (Prob. Code, § 11000, subd. (a)(2) and (3).) Here, the probate court reasoned, "Mark's contingent remainder interest in the estate, however, was so far removed from McKie Sr. that his interest *could* be affected only by the account, potentially, and did not amount to an heir whose interest *would* be affected by the account, certainly, as the Legislature intended." (Further undesignated statutory references are to the Probate Code.) The probate court further found that, as a contingent remainder beneficiary, Mark was not statutorily entitled to personal notice under sections 1201, 1202, and 1206.

[3] The probate court described the two "condition precedents" or contingencies that had to occur for Mark to have an interest in the FYR Trust

10

concluded, "In these circumstances, although he may have had an abstract concern in obtaining an inheritance through McKie Jr., Mark did not have a *property* interest sufficient to require the trustee, other beneficiaries, or the Court to notice him of the hearing when the orders were issued approving the settlement agreement and distributing the estate's funds, and more importantly, approving McKie Jr.'s actions as to his vested interest in the trust and estate at that time."

Third, the court rejected Mark's argument that the 1991 Decree modified the FYR Trust by changing the default distribution provision specified in the MWR Will. The court reasoned that the signatories to the Settlement Agreement "did not modify the terms of the testamentary trust. Instead, they bargained for the vesting and release of their interests."

In its conclusion, the court denied Mark's petition for an order directing the trustee to recognize him as a beneficiary of the trust and other relief.

## DISCUSSION

A.    *Standard of Review*

We review de novo questions of law submitted on stipulated facts. (*Employers Mutual Casualty Co. v. Philadelphia Indemnity Ins. Co.* (2008) 169 Cal.App.4th 340, 347.) We independently review due process claims "because 'the ultimate determination of procedural fairness amounts to a question of law.' " (*In re Jonathan V.* (2018) 19 Cal.App.5th 236, 241.)

---

as (1) "Yvonne had to leave property in trust for distribution to McKie Jr." and (2) "McKie Jr. had to outlive Yvonne before receiving his interest in the trust," but "[n]either of these contingencies occurred."

11

B.    *Mark Was Entitled to Notice of the Proceeding that Resulted in the 1991 Decree as a Matter of Due Process Because the Decree Affected His Property Interest in the FYR Trust*

Mark contends due process required that he be mailed notice of the proposed change to the default distribution provision and an opportunity to be heard before the probate court could issue the 1991 Decree because that decree affected his property interest in the FYR Trust.  Respondents argue Mark had no due process right to notice because he had no property right in the FYR Trust or, alternatively, because his property right was so remote, mailed notice was not required.  We agree with Mark.

1.    Due Process Requires Reasonable Notice of Any Proceeding Adversely Affecting a Property Interest

In 1950, the United States Supreme Court in *Mullane v. Central Hanover Bank & Trust Co.* (1950) 339 U.S. 306, 314 (*Mullane*) "recognized that prior to an action which will affect an interest in life, liberty, or property protected by the Due Process Clause of the Fourteenth Amendment, a State must provide 'notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' . . . [T]he Court held that published notice of an action to settle the accounts of a common trust fund was not sufficient to inform beneficiaries of the trust whose names and addresses were known.  The Court explained that notice by publication was not reasonably calculated to provide actual notice of the pending proceeding and was therefore inadequate to inform those who could be notified by more effective means such as personal service or mailed notice."  (*Mennonite Bd. of Missions v. Adams* (1983) 462 U.S. 791, 795 (*Mennonite*).)

In *Mennonite*, the United States Supreme Court succinctly stated the rule, "Notice by mail or other means as certain to ensure actual notice is a

minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interests of *any* party . . . if [that party's] name and address are reasonably ascertainable." (*Mennonite*, *supra*, 462 U.S. at p. 800.)

In California, courts have applied *Mullane* in probate matters since at least 1968. In *Estate of Reed* (1968) 259 Cal.App.2d 14, a decedent's will created a trust under which his children Paul and Bessie each received half of the income of the trust, the trust was to end upon the death of Bessie, and Paul was given the power of appointment over both his half of the income and the corpus of the trust at its termination. (*Id*. at p. 15.) Paul died before Bessie, and his will left the remainder of his estate to three named charities. After Paul died, the trustee filed a sixteenth account of the trust, which included a request that the probate court find Paul's will was ineffective as an exercise of the appointment power over the trust. The trustee, however, did not give notice of the sixteenth account of the trust to any of the three charities named in Paul's will even though the trustee knew about these residuary charity beneficiaries. Following the trustee's request, the probate court in 1954 made an order finding Paul failed to exercise his power of appointment. In 1967, after Bessie died and the trust terminated, the three named charities moved to vacate the 1954 order, and the probate court granted the motion. (*Id*. at pp. 16–19.)

The Court of Appeal affirmed, observing that *Mullane* "on the facts before us, clearly holds that the statutory notice cannot be equated with due process." (*Estate of Reed*, *supra*, 259 Cal.App.2d at p. 20.) The court explained, "*Mullane* discusses at some length the in rem character of some judgments but holds that a proceeding to determine the rights of beneficiaries under a trust is not embraced within the in rem classification

13

and that *when the rights of beneficiaries to a trust are inevitably affected, they are entitled to notice* and are indispensable parties.  The mere statement of this principle as a general proposition, is to accept it." (*Id* at p. 21, italics added.)  "At the very least, the beneficiaries [i.e., the three charities] in the present case were entitled to notice 'reasonably calculated' to reach them. . . . The statutory notice which was given was in effect no notice to respondents." (*Id*. at p. 22, fn. omitted.)  The court concluded, "the failure of the trustee to join the respondents and/or give more adequate notice to enable them to defend their interests in the trust resulted in a *void* order." (*Ibid*., italics added.)

In 1975, an appellate court citing *Mullane* stated, "The United States Supreme Court has now made it clear that blind labeling of probate proceedings as 'in rem' does not satisfy constitutional requirements of due process.  Those requirements mandate that 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. . . .' is necessary to meet constitutional standards." (*Estate of Lacy* (1975) 54 Cal.App.3d 172, 187.)[4]

---

[4] The United States Supreme Court itself applied *Mullane*/*Mennonite* due process principles in the probate context in *Tulsa Professional Collection Services, Inc. v. Pope* (1988) 485 U.S. 478.  In that case, the court recognized that an unsecured creditor's claim against an estate was an intangible property interest protected by the Fourteenth Amendment and that statutory notice of the debtor's probate by publication alone did not necessarily comply with due process.  As to known or reasonably ascertainable creditors, *actual* notice of the debtor's probate proceeding was required for a state nonclaims statute to satisfy due process. (*Id*. at pp. 480–481, 485–490.)

2. <u>Mark Had a Property Interest in the FYR Trust</u>

As we have seen, the MWR Will created the FYR Trust, granted Yvonne a testamentary power of appointment over the remainder of the trust, and provided a default distribution if Yvonne did not exercise her testamentary power of appointment. In case of default, the MWR Will provided that the remainder "shall, upon the death of my said wife, be distributed in equal portions to McKie W. Roth, Jr., Diane Roth Lauer, Joanne Roth Gibbons and James Barron, provided however if such persons should not be then living, but leave issue surviving them, then such issue shall take per stirpes, the portion that such individual would have taken if then living . . . ."

We agree with the probate court that the FYR Trust came into existence at the death of McKie Sr. pursuant to the MWR Will and that Mark's "future interest as contingent remainder beneficiary also came into existence when McKie Sr. died." (See *Ludwicki v. Guerin* (1961) 57 Cal.2d 127, 131–132 [if a will "creates an express trust, the legal title of the trustee and the equitable title of the beneficiary vest as of the date of death" of the testator]; (*Estate of Baird* (1955) 135 Cal.App.2d 333, 341 [regardless of whether their remainder interests were vested or contingent, the interests of the remaindermen came into existence on the testator's death]; *Estate of Lefranc*, *supra*, 38 Cal.2d at pp. 291, 297 [where income of a testamentary trust was to go to the decedent's niece during her life and, upon the niece's death, contingent remaindermen were to take the balance of a trust, the remaindermen held "future interests" that came into existence at the decedent's death]; § 24, subd. (c) [as it relates to a trust, a "beneficiary" includes "a person who has any present or future interest, vested or contingent"].)

Mark's property interest in the FYR Trust was contingent, not vested, because Mark would only take a share of the remainder if certain conditions precedent occurred: McKie Jr. had to predecease Yvonne ("not be then living" upon Yvonne's death) and Mark had to survive McKie Jr. ("leave issue surviving them"). Further, there had to be some balance left in the trust at its termination and Yvonne had to refrain from using her testamentary power of appointment. Mark's interest was future, not present, because he could only take a share of the remainder upon Yvonne's death in the future.

But we reject the probate court's determination that Mark "had no more than a unilateral expectation to a share of the [FYR] Trust." Mark had an actual property interest in the trust as set forth in the MWR Will. Mark's property interest was contingent and subject to divestiture if Yvonne exercised her testamentary power of appointment, but it was more than a "mere unilateral expectation" as claimed by respondents. First, "[t]he law has long recognized that a contingent future interest is property [citation] no matter how improbable the contingency" (*In re Marriage of Brown* (1976) 15 Cal.3d 838, 846, fn. 8), and "a contingent remainder is an estate and not a mere expectancy" (*Estate of Zuber* (1956) 146 Cal.App.2d 584, 591). Second, takers in default (i.e., persons specified by a donor of a power of appointment to take property in default of the appointment) hold property interests even though "their interests are subject to complete divestment" through exercise of a power of appointment. (*Ammco Ornamental Iron, Inc. v. Wing* (1994) 26 Cal.App.4th 409, 418-419 ["persons in existence, who are specifically designated in a trust instrument to take in default of the exercise of a power of appointment by the holder of the preceding estate, are beneficiaries of that trust and acquire vested remainder interests, although their interests are subject to complete divestment"]; see § 672, subd (a) ["if the powerholder of a

16

discretionary power of appointment fails to appoint the property, releases the entire power, or makes an ineffective appointment, in whole or in part, the appointive property not effectively appointed passes to the person named by the donor as taker in default"].)  Thus, Mark's contingent future interest in the remainder of the FYR Trust created by the MWR Will upon McKie Sr.'s death was a cognizable property interest, not a mere expectancy, and this property interest did not disappear simply because it was subject to complete divestment if Yvonne chose to exercise her testamentary power of appointment.

3.  The 1991 Decree Adversely Affected Mark's Property Interest

If a proceeding will "adversely affect" a person's property interest, due process requires that the person be given notice by mail of the proceeding and an opportunity to be heard when the person's name and address are reasonably ascertainable.  (*Mennonite*, *supra*, 462 U.S. at pp. 795, 800.)  That the 1991 Decree adversely affected Mark's property interest in the FYR Trust seems undeniable.  Under the MWR Will, Mark had a contingent future remainder interest in the trust, but under the 1991 Decree, he had no property interest in the trust.

Respondents, however, take the position the 1991 Decree did not affect Mark's property interest because Mark lost his interest under the MWR Will when McKie Jr. signed the Settlement Agreement.  Respondents rely on the language of the default distribution provision that if the identified adult children "should not be then living, but leave issue surviving them, then such issue shall take per stirpes, the portion *that such individual would have taken if then living*."  (Italics added.)  Respondents argue that, if McKie Jr. had been living, he would not have taken anything because he disclaimed his

17

interest in the FYR Trust in the Settlement Agreement, and urge that Mark likewise must take nothing.

But the Settlement Agreement did not alter the MWR Will. (*Estate of Muhammad* (1971) 16 Cal.App.3d 726, 736 (*Muhammad*) [an agreement of compromise, even when approved by the court, does not modify the will; the rights of parties under the agreement are contractual not testamentary].) Nor could the Settlement Agreement bind Mark, who was not a party to the agreement. (*Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 810–811 [a settlement agreement is a contract, and an essential element of any contract is consent]; see *Ferraro v. Camarlinghi* (2008) 161 Cal.App.4th 509, 542 [stipulated judgment based on settlement agreement had no preclusive effect on a stranger to the settlement agreement].)

The phrase "that such individual would have taken if then living" as used in the MWR Will, therefore, cannot reasonably be read to incorporate later contracts McKie Jr. may have made promising not to enforce his own contingent remainder interest. As Mark argues, "because McKie Sr. could not possibly know or control what circumstances might occur beyond his will, he obviously meant that Mark might take the share that McKie Jr. would take *by virtue of the terms of the MWR Will* if McKie Jr. was living at the time of Yvonne's death."[5]

---

[5] We also note that the MWR Will provided, "Each and every beneficiary under this trust is hereby restrained from and is and shall be without right, power or authority to sell, transfer, pledge, mortgage, hypothecate, alienate, or in any other manner affect or impair his or her beneficial or legal right, title, interest, claim or estate in and to the income and principal, or income or principal, of this trust during the entire existence thereof . . . ." This spendthrift provision further shows it was McKie Sr.'s intent that the beneficiaries of the FYR Trust not be allowed to contract away their interests in the trust. That the disclaimers by McKie Jr., Diane, and Joanne of their own interest in the FYR Trust are nonetheless enforceable by

18

Here, we disagree with the probate court's interpretation of what the Settlement Agreement accomplished. It believed McKie Jr. bargained for the vesting and release of his interest in the FYR Trust. But McKie Jr. could only disclaim his *own* interest in the FYR Trust, which was a contingent remainder. His interest could not vest until the condition precedent of surviving Yvonne occurred (and this did not occur). Nor did Yvonne have the power to "vest" McKie Jr.'s interest in the trust before she died. She had a *testamentary* power of appointment, meaning she could appoint the remainder in a will. She could not appoint the remainder while she was alive, and she could not exercise her power by any instrument other than a will. (See § 630, subd. (a) ["if the creating instrument specifies requirements as to the manner, time, and conditions of the exercise of a power of appointment, the power can be exercised only by complying with those requirements"].) Accordingly, Yvonne and McKie Jr. could not agree to "vest" McKie Jr.'s contingent interest in the FYR Trust in a manner that would destroy Mark's contingent remainder interest.[6] Moreover, the Settlement Agreement involved claims McKie Jr., Diane, and Joanne made, as

---

the trustee *against them* is a matter of contract, not because the Settlement Agreement modified the terms of the MWR Will. (See *Estate of Muhammad*, *supra*, 16 Cal.App.3d at p. 736 [where the beneficiaries reached a settlement agreement regarding the administration of a testamentary trust, "the rights of the parties so far as they rest upon the agreement are contractual and not testamentary"].)

[6] McKie Jr. and his siblings agreed that the Settlement Agreement would be binding on "their respective legal representatives, successors and assigns." To the extent respondents suggest Mark is bound by the Settlement Agreement because he is McKie Jr.'s successor, this suggestion is unavailing. Mark does not claim a share of the remainder of the FYR Trust as the successor or assignee of McKie Jr.'s property right. Mark's property right in the trust arises directly from the MWR Will.

beneficiaries of the Marion Roth Trust, against McKie Sr. for alleged misconduct in managing that trust.[7] Mark had nothing to do with these claims, which were not related to the FYR Trust.

In short, we reject respondents' claim that McKie Jr. effectively signed away Mark's property interest in the FYR Trust through the Settlement Agreement. It was only the 1991 Decree, and not the earlier Settlement Agreement, that affected Mark's property interest in the FYR Trust by eliminating his contingent remainder interest.

4. Due Process Required Notice to Mark of the Proceeding That Resulted in the 1991 Decree

Because the 1991 Decree adversely affected Mark's property interest in the FYR Trust, he was entitled to notice by mail and an opportunity to be heard if his name and address were reasonably ascertainable. (*Mennonite*, *supra*, 462 U.S. at pp. 795, 800.)

At the time the 1991 Decree was adopted, Mark was McKie Jr.'s adult son and McKie Sr.'s grandson, and Jelley had apparently been dealing with disputes with McKie Jr. (and his siblings) for some years. It appears Jelley only had to ask McKie Jr. for the names and addresses of his existing children in order to provide Mark mailed notice.[8] Mark has maintained below and on appeal that his existence and whereabouts were either known

---

[7] Recall that McKie Sr.'s children settled claims against McKie Sr. in his capacity as trustee of the Marion Roth Trust, and the payment to them was made by McKie Sr.'s estate, not the FYR Trust. Although McKie Sr.'s children agreed to give up their contingent remainder interests in the FYR Trust as part of the settlement, the primary purpose of the Settlement Agreement was to settle claims unrelated to the FYR Trust.

[8] Likewise, Jelley should have ascertained the names and addresses of any children of Diane and Joanne since such persons were readily identifiable contingent remaindermen and the proposed 1991 Decree adversely affected their property interests in the FYR Trust by eliminating their interests.

20

or reasonably ascertainable, and respondents do not contest this point. Under these circumstances, we conclude due process required that Mark be given mailed notice of the probate hearing that resulted in the 1991 Decree and an opportunity to object.

Respondents claim that even if Mark had a property interest in the FYR Trust, *Mullane* does not require actual notice "given the remoteness of his interest." They rely on the *Mullane* court's observation, "Nor do we consider it unreasonable for the State to dispense with more certain notice to those beneficiaries whose interests are *either conjectural or future* or, although they could be discovered upon investigation, do not in due course of business come to knowledge of the common trustee." (*Mullane, supra,* 339 U.S. at p. 317, italics added.) They argue this observation shows Mark was not entitled to mailed notice. We are not persuaded.

First, Mark's property interest in the FYR Trust was not conjectural. The MWR Will created a contingent future remainder interest in the trust. Second, we do not read *Mullane* to mean due process notice requirements do not apply to holders of future property interests. In *Mullane*, the appellant was "appointed special guardian and attorney for all persons known or unknown not otherwise appearing who had *or might thereafter have* any interest in the income of the common trust fund." (*Mullane, supra,* 339 U.S. at p. 310, italics added.) In this context, when the court spoke of interests that were "future," it likely was referring to persons who did not currently have a property interest in the common fund but might acquire an interest in the future, not to beneficiaries who currently had future property interests in the fund. On the other hand, if the court did mean current beneficiaries with future interests were not entitled to mailed notice, the court may have determined that, because the common fund involved 113 trusts (*id*. at p. 309),

21

it was too burdensome to expect the trustee to attempt to identify all current holders of future interests in the fund; but even if that was the court's reasoning, it would not apply here since it cannot be said in this case that it would have been burdensome for the trustee to ask the three adult children of McKie Sr. for the names and addresses of their own children. In any event, we do not think the *Mullane* court intended to *exclude* reasonably ascertainable holders of future property interests from due process considerations.

That holders of future property interests *are* entitled to notice as a matter of due process is demonstrated by the facts of *Estate of Reed*. There, the court recognized that three charity beneficiaries were entitled to notice of Paul's probate proceeding in 1954 even though the charities at that time held only future interests in the remainder of the trust (and their interest only became present when Bessie died in 1964). (*Estate of Reed*, *supra*, 259 Cal.App.2d at pp. 16–17, 22.) The court recognized, "[W]hen the rights of beneficiaries to a trust are inevitably affected, they are entitled to notice and are indispensable parties." (*Id* at p. 21.) The court did not differentiate property interests that were present from property interests that were future.

Respondent's claim fails for another reason. They argue *Mullane* does not require mailed notice given the remoteness of Mark's interest. But "even remote interests are entitled to a measure of due process." (*Estate of Sigourney* (2001) 93 Cal.App.4th 593, 604, citing *Mullane*, *supra*, 339 U.S. at pp. 317–318.) In *Mullane*, the court held that published notice of the trustee's petition for settlement of account was sufficient as to "[t]hose beneficiaries represented by appellant whose interests or whereabouts could not with due diligence be ascertained." (*Mullane*, *supra*, 339 U.S. at p. 317.) Here, on the other hand, respondents do not claim Mark was given

constructive notice by publication of the hearing that resulted in the 1991 Decree. We believe Mark was entitled to mailed notice under the circumstances presented, but there can be no doubt he was entitled to *some* form of notice, and he was given none.

Respondents also argue that, in his capacity as executor of McKie Sr.'s estate, Jelley followed the statutory requirements for notice of probate proceedings and that should be enough to satisfy due process. But *Mullane* itself shows that meeting a state's statutory notice requirements does not automatically satisfy federal due process. (*Mullane*, *supra*, 339 U.S. at p. 319 [holding "statutory notice to known beneficiaries" was inadequate as a matter of due process].) Citing *Mullane*, Division Four of this court has observed, "Notice given according to statutory ritual will not necessarily meet due process standards." (*Dohrmann Co. v. Security Savings & Loan Assn.* (1970) 8 Cal.App.3d 655, 664.)

*Estate of Sigourney*, *supra*, 93 Cal.App.4th 593, is instructive on this point. In that case, decedent Sigourney left a will that created a charitable trust, named the initial two cotrustees, and provided that the successor trustee was to be selected by the American Psychoanalytic Association (APA). The executor of Sigourney's estate filed a petition to construe, amend, and conform the will and trust in a manner allegedly consistent with Sigourney's intent (petition to amend). The petition asked the probate court to amend the charitable trust provisions so that the APA would not have ultimate authority to select the successor trustees. But the executor gave no notice to the APA of the petition to amend. In 1989, the probate court granted the petition and amended the terms of the charitable trust as proposed by the executor. (*Id.* at pp. 596–598.)

23

Over 10 years later in 1999, one of the original trustees of the charitable trust filed a petition for instructions in the matter of Sigourney's estate regarding appointing a successor trustee. At that point, the APA objected and argued the 1989 order amending the terms of the charitable trust should be declared void because the APA was not given notice of the proceeding that resulted in the 1989 order. (*Estate of Sigourney*, *supra*, 93 Cal.App.4th at pp. 597–599.) The probate court granted the petition over the objection, finding the APA was not entitled to statutory notice of the earlier petition to amend, and the APA could not collaterally attack the 1989 order. (*Id*. at pp. 600–601.)

On appeal, the trustee of the charitable trust and the APA raised various arguments about whether notice of the proceeding that resulted in the 1989 order was required under various statutes. The Court of Appeal acknowledged, "None of these statutory paths to a notice requirement leads to a clear-cut answer. But constitutional due process principles do." (*Estate of Sigourney*, *supra*, 93 Cal.App.4th at p. 603.) The court then held the APA was entitled to notice of the 1989 proceedings, finding the APA's "rights and powers" related to the selection of a trustee amounted to a property interest protected by due process. (*Id*. at p. 604.) The court reasoned that, in 1989, the executor knew or should have known that the APA would have an opportunity to exercise its power to select a cotrustee and that, as a result, the executor should have given the APA notice of the proposed amendment. The court observed that the lack of notice deprived the APA of the opportunity to advocate in favor of its interpretation of the will and argue against the "redraft" of the will proposed by the executor. (*Id*. at p. 605.) The court concluded with the observation, "We are constrained to add for the trial court's guidance that a trust can be modified if provisions are ambiguous or if

24

'slavish adherence" to the terms of the trust would defeat the primary purpose of the trust; but neither former Probate Code section 17200 nor the common law of trusts permits the creation of a new agreement under the guise of a modification or reformation." (*Ibid*.)

In *Estate of Sigourney*, the court held that where a will gave an organization authority to select future trustees of a testamentary charitable trust, that organization had a property interest in the selection power created by the will, and the executor could not simply eliminate the organization's interest in the charitable trust under the guise of construing the will without providing notice to the organization and opportunity to be heard. Similarly, in this case, the executor could not eliminate Mark's contingent remainder interest in the FYR Trust without notice to him under the guise of a petition for final distribution of McKie Sr.'s estate.

Finally, respondents suggest that requiring notice in this case will cause great uncertainty for practitioners administering estates because they will not be able to rely on compliance with statutory notice requirements to meet their due process obligations. We do not share their concern. The reason Mark is entitled to notice of the proceeding that resulted in the 1991 Decree is that the executor of McKie Sr.'s estate used this final order of distribution as a vehicle to change the terms of the FYR trust in a manner that eliminated Mark's property interest. If a reasonably ascertainable person has a property interest in a testamentary trust, it is not unreasonable or onerous to require the executor to give notice to that person when the executor seeks a court order in the testator's probate case that would *change* the terms of the trust from those specified in the testator's will in a manner that *adversely affects* the person's property interest.

C.    *The 1991 Decree is Void*

In *Estate of Reed*, *supra*, the interested charities were not given notice of the sixteenth accounting which resulted in the 1954 order finding Paul did not exercise his power of appointment.  The court concluded the failure to give notice to the charities and an opportunity to defend their interests meant that the 1954 order was void.  (*Estate of Reed*, *supra*, 259 Cal.App.2d at p. 22.)  In *Estate of Lacy*, *supra*, the court held that if trustees knew of the existence of the remaindermen when the trustees petitioned for approval of their account but did not give notice of the hearing to the known remaindermen, under *Mullane* and *Estate of Reed*, the failure of notice "would render void the order approving the act." (*Estate of Lacy*, *supra*, 54 Cal.App.3d at pp. 188, 190–191.)  Here, Mark did not receive notice of the proceeding at which the court adopted the 1991 Decree and he had no opportunity to object to the elimination of his property interest in the FYR Trust.  Therefore, the 1991 Decree is void.

Respondents' attempts to salvage the 1991 Decree are unavailing.  They argue the 1991 Decree cannot be collaterally attacked, citing *Estate of Callnon* (1969) 70 Cal.2d 150, 157, in which the court stated, "If the decree erroneously interprets the intention of the testator it must be attacked by appeal and not collaterally.  [Citations.]  If not corrected by appeal an 'erroneous decree . . . is as conclusive as a decree that contains no error.' "  *Estate of Callnon*, however, did not involve a claim of voidness based on lack of notice.  "The doctrine of res judicata is inapplicable to void judgments." (*Rochin v. Pat Johnson Manufacturing Co.* (1998) 67 Cal.App.4th 1228, 1239.)  A void judgment " 'may be attacked anywhere, directly or collaterally, whenever it presents itself.' " (*Andrews v. Superior Court of San Joaquin County* (1946) 29 Cal.2d 208, 214.)  In *Estate of Reed*, for example, the

charities successfully moved to set aside a 1954 probate court order for failure of notice more than a decade later in 1967. (259 Cal.App.2d at p. 18.)

Respondents next argue Mark's petition fails because he cannot prove he would be entitled to a different decree. The simple answer to this is he would have been entitled to a different decree that did not eliminate his property interest. Had Mark been given notice of the proposed 1991 Decree, he could have objected on the ground the Settlement Agreement could not affect his contingent future remainder interest in the FYR Trust and he could have argued (successfully) that the proposed change to the default distribution provision improperly eliminated his property interest.

Throughout their appellate brief, respondents suggest the equities favor affirming the probate court's order denying Mark's petition because it would accomplish Yvonne's apparent intention to leave the remainder of the FYR Trust solely to James. But respondents offer no authority for the proposition that such equitable considerations can excuse the taking away of Mark's property interest without notice and an opportunity to be heard.[9]

We also agree with Mark's response to respondents' claims of equity. He asserts, "[T]he equities are clearly not in Respondents' favor. On the one hand is Mark, a person whose grandfather gave him an interest in the FYR Trust residue and which interest was taken from him without his knowledge and without him having any opportunity to object. There was no evidence before the probate court, and there is none before this Court, that Mark knew anything about the 1991 Decree of Distribution or its purported effect on his interest until he inquired of Respondent Jelley about that interest after

---

[9] We further note it was testator McKie Sr.'s expressed intent that, if Yvonne exercised her power of appointment, she do so "by will duly admitted to probate and specifically referring to and exercising this power of appointment," and Yvonne did not do that.

27

Yvonne's death. . . . On the other hand is Respondent Jelley, whose law firm represented Yvonne at least when she filed the Declination of Exercise of Power of Appointment, whose law firm represents James now, and who was the petitioner for the original probate proceeding, the petitioner for approval of the Settlement Agreement in 1990, and the petitioner for the 1991 Decree of Distribution. He is the person who did not give Mark notice of the Petition for Final Distribution or the 1991 Decree of Distribution and thereby created whatever inequity he claims were thereafter visited upon his clients. It is Mr. Jelley who, through the auspices of the probate court, wrongfully took the interest that McKie Sr. had given Mark and did so without bothering to give notice to Mark and an opportunity to be heard. It is hardly unfair to charge him and his clients with the consequences and not reward them for wrongfully taking Mark's interest and then hiding such action from him for the remainder of Yvonne's life."

## DISPOSITION

The order denying the petition filed September 27, 2018, is reversed, and the matter is remanded for further proceedings consistent with this opinion. Respondents' request for judicial notice is denied.[10]

---

[10] The documents respondents ask us to take judicial notice of are not relevant to the issues raised in this appeal. (See *Hill v. San Jose Family Housing Partners, LLC* (2011) 198 Cal.App.4th 764, 770 [declining to take judicial notice of a document that was "not relevant to our consideration of the issues raised on appeal"]; *Mangini v. R.J. Reynolds Tobacco Co. (*1994) 7 Cal.4th 1057, 1063 [matters subject to judicial notice must be relevant to issues raised on appeal], overruled on another ground in *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1276.)

28

_____

Miller, J.

We concur:

_____

Kline, P.J.

_____

Stewart, J.

A155742, *Roth v. Jelley*

29

Trial Court:  Superior Court of Contra Costa County


Trial Judge:  Hon. John H. Sugiyama


Law Offices of James A. Bush, P.C., James A. Bush, for Plaintiff and Appellant


Donahue Fitzgerald LLP, Lawrence K. Rockwell, Daniel B. Newbold, Lorin B. Bender, for Defendants and Respondents


A155742, *Roth v. Jelley*